# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| | } | |
| v. | } | Case No.: **5:19-cr-0009-MHH-JEO** |
| | } | |
| BARRY LEE WILLIAMS, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION AND ORDER

Defendant Barry Lee Williams is charged in the indictment in this case with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). (Doc. 1). Pursuant to the Fourth Amendment, Mr. Williams has asked the Court to suppress evidence that law enforcement officers found when they searched an area that was beyond the property line of his house. As stated during the suppression hearing, the Court denies that aspect of Mr. Williams's motion to suppress because Mr. Williams did not have a reasonable expectation of privacy in the area that officers searched. (Doc. 68, p. 35).

In addition, pursuant to the Fifth Amendment, Mr. Williams asks the Court to suppress inculpatory statements that he made during a custodial interrogation. (Docs. 47, 67). Mr. Williams contends that he invoked his Fifth Amendment right to remain silent, and after doing so, law enforcement officers used a cooperating witness to persuade him to tell officers where he had hidden a substantial amount of

meth.  (Doc. 47, pp. 3, 6; Doc. 67, pp. 2-3; Doc. 68, p. 29).  Mr. Williams asserts that the coercive tactics officers used to elicit his inculpatory statements violate his rights under the Fifth Amendment.  (Doc. 67, p. 2).  This opinion addresses Mr. Williams's suppression arguments concerning his rights under the Fifth Amendment.[1]

## FACTUAL FINDINGS

On February 3, 2018, the Morgan County Sheriff's Office and other law enforcement agencies served a search warrant on Mr. Williams at his residence at 850 Pleasantview Road in Morgan County, Alabama.  (Doc. 68, p. 3).[2]  At least 10 officers participated in the investigation at Mr. Williams's house.  (Doc. 68, p. 12).  The officers used a battering ram to enter the house.  (Doc. 68, p. 12).  When law enforcement officers found Mr. Williams, they placed him in handcuffs and advised him of his *Miranda* rights.  (Doc. 68, pp. 4-6, 14-15).[3]  Mr. Williams agreed to talk

---

[1] In his supplemental motion to suppress, Mr. Williams expands his constitutional challenge to include a Sixth Amendment argument.  The authority on which he relies in doing so pertains to post-indictment conduct by law enforcement officers.  (Doc. 67) (citing, *e.g.*, *United States v. Henry*, 447 U.S. 264 (1980)).  Because Mr. Williams made the inculpatory statements at issue pre-indictment, the Court will not consider Mr. Williams's arguments under the Sixth Amendment.

[2] The date on the search warrant is incorrect.  (Doc. 68, p. 11).  The mistake is not relevant to Mr. Williams's motion to suppress.

[3] Counsel for Mr. Williams pointed out that Mr. Williams did not sign a waiver of rights, and counsel argued at the suppression hearing that he believed it was "highly questionable" that officers advised Mr. Williams of his *Miranda* rights "given the sheer number of agents and the total lack of any evidence of it whatsoever, the failure to provide a written warning even understanding the severity and how long this investigation had been going on, they still chose not to do that."  (Doc. 68, pp. 15, 30).  The case agent, Sergeant Dockery, testified that he advised

to the officers. He told the officers where they could find methamphetamine in his house. Officers searched Mr. Williams's house and found methamphetamine and other items associated with the distribution of illegal drugs. (Doc. 68, pp. 5-6). The officers then moved Mr. Williams to the front porch so that they could search his yard. (Doc. 68, pp. 6, 14). They were looking for a large quantity of methamphetamine, based on a tip from one of Mr. Williams's associates.

Earlier in the day, law enforcement officers had arrested Mr. Williams's associate – Froggy – on outstanding warrants. Froggy's full name is Melvin Rolin. From the time of his arrest, Froggy cooperated with the officers. He took officers to Mr. Williams's house, and he called the courier who delivered the shipment of methamphetamine to Mr. Williams's house to confirm the delivery. (Doc. 68, pp. 7, 23, 26). Based on the information they received from Froggy, the officers at Mr. Williams's house were convinced that a large quantity of meth was hidden on Mr. Williams's property, but they could not locate it, even with the help of a K-9 officer. (Doc. 68, pp. 10, 20).

Sergeant Dockery, the case agent, decided to approach Mr. Williams and let him know that Froggy was in police custody. (Doc. 68, pp. 15, 20). Sergeant

---

Mr. Williams of his *Miranda* rights. The record contains no testimony that contradicts Sergeant Dockery's testimony on this point, and the Court finds the testimony credible. Therefore, the Court finds that shortly after officers placed Mr. Williams in handcuffs, the officers advised Mr. Williams of his *Miranda* rights.

Dockery had not spoken to Mr. Williams since officers moved him to the front porch, and there is no evidence that Mr. Williams spoke to other officers while he waited on the porch. The record does not indicate how long officers had been searching Mr. Williams's yard before Sergeant Dockery decided to approach Mr. Williams. When Sergeant Dockery told Mr. Williams that the police had Froggy in custody, Sergeant Dockery got the impression that Mr. Williams did not believe him. (Doc. 68, pp. 7, 21).

Officers were holding Froggy in a patrol car at a staging area near Mr. Williams's house. (Doc. 68, p. 21). Sergeant Dockery left Mr. Williams's house and drove to the staging area to speak to Froggy. He told Froggy that he had not been able to find the meth that Mr. Williams supposedly had hidden. Froggy agreed to speak to Mr. Williams. (Doc. 68, pp. 21-22, 27). Officers brought Froggy to Mr. Williams's house and gave Mr. Williams and Froggy (both of whom were handcuffed) a few minutes to talk. (Doc. 68, pp. 22-23, 27). Sergeant Dockery stood nearby as Froggy and Mr. Williams spoke and overheard some of their conversation. (Doc. 68, pp. 7, 24).[4] Mr. Williams asked Sergeant Dockery about the charges that he likely was facing. Sergeant Dockery explained that he (Mr. Williams) likely

---

[4] In his motion to suppress, Mr. Williams asserts that during his conversation with Froggy, Froggy said, "They got us. Somebody did us. You should just go ahead and cooperate and tell them where the drugs are." (Doc. 47, p. 5, ¶ 17). There was no testimony in this regard during the suppression hearing.

would be charged with conspiracy to traffic methamphetamine. Mr. Williams then led officers to a brush pile beyond the end of his property where he had hidden methamphetamine pills. (Doc. 68, pp. 7-9, 25).

## DISCUSSION

When an individual in police custody asserts his right to remain silent or to have the assistance of counsel, police must "scrupulously honor[]" the individual's choice and stop their interrogation. *Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). Mr. Williams contends that by remaining silent while officers searched his yard, he invoked his right to remain silent. The Supreme Court rejected this argument in *Berghuis v. Thompkins*, 560 U.S. 370 (2010).

In *Berghuis*, the Supreme Court held that an individual who wants to invoke his Fifth Amendment right to remain silent must do so unambiguously; remaining silent for a period of time is not sufficient. *Berghuis*, 560 U.S. at 380-82. The Supreme Court explained:

> [Tomkins] first contends that he "invoke[d] his privilege" to remain silent by not saying anything for a sufficient period of time, so the interrogation should have "cease[d]" before he made his inculpatory statements . . . Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his "'right to cut off questioning.'" *Mosley, supra,* at 103, 96 S.Ct. 321 (quoting *Miranda, supra,* at 474, 86 S.Ct. 1602). Here he did neither, so he did not invoke his right to remain silent.

560 U.S. at 380-81.

There is no discernable difference between *Berghuis* and this case. Shortly after officers entered Mr. Williams's house and placed him in handcuffs, Sergeant Dockery advised Mr. Williams of his right to remain silent. Mr. Williams chose to tell officers about the methamphetamine located in his house; he does not contend otherwise. There is no evidence that Mr. Williams spoke to officers after the officers moved him to the front porch so that they could search his yard, but there also is no evidence that Mr. Williams indicated to the officers that he did not want to speak to them. Per *Berghuis*, Mr. Williams did not invoke his right to remain silent by not saying anything to officers while he was on his front porch.

Mr. Williams argues that even if he did not invoke his right to remain silent, his statements and actions relating to the large quantity of methamphetamine that he hid in the brush beyond his property are inadmissible because police coerced the statements from him. Again, *Berghuis* supplies the governing principle: "Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." 560 U.S. at 382 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate

choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Mr. Williams argues that Froggy was an agent of the government, and law enforcement officers used Froggy to coerce him to reveal the location of the methamphetamine hidden in the brush.

Mr. Williams properly characterizes Froggy as an agent of the government. As the Eleventh Circuit Court of Appeals has explained,

[f]or a private person to be considered an agent of the government, we look to two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends.

*United States v. Steiger,* 318 F.3d 1039, 1045 (11th Cir. 2003). Here, the record demonstrates that Sergeant Dockery invited the intrusive conduct. When Mr. Williams's body language indicated to Sergeant Dockery that Mr. Williams did not believe that officers had Froggy in custody, Sergeant Dockery drove to the staging area where Froggy was detained, and Sergeant Dockery asked Froggy if he would speak to Mr. Williams. Froggy agreed, and law enforcement officers brought Froggy to Mr. Williams's house to meet Mr. Williams. Thus, Sergeant Dockery knew of and participated in the intrusive conduct. No doubt, Froggy hoped that his cooperation with officers would help him resolve the criminal charges that he was

facing, but Froggy could not help himself without helping Sergeant Dockery persuade Mr. Williams to reveal the location of the methamphetamine. Therefore, when Froggy spoke to Mr. Williams, he did so as an agent of law enforcement officers.

Thus, the admissibility of Mr. Williams's statements and conduct (i.e., leading officers to the brush pile where he had hidden illegal drugs) turns on the extent to which Sergeant Dockery's decision to bring Froggy to Mr. Williams's house to persuade Mr. Williams to divulge the location of the drugs amounts to impermissible coercion. "The voluntariness of a defendant's statement is a question of law." *United States v. Farley*, 607 F.3d 1294, 1326 (11th Cir. 2010). "The government has the burden of showing the knowing and intelligent nature of a waiver." *Farley*, 607 F.3d at 1326 (citing *Miranda*, 384 U.S. at 475).

In *Berghuis*, the Supreme Court listed a few examples of coercion: threats, injury, and sleep and/or food deprivation. 560 U.S. at 386-87. Sergeant Dockery's conduct is not equal to these examples of coercive conduct, but the Supreme Court's list in *Berghuis* is not exhaustive. "Unlike physical violence or the threat of it, which makes any resulting statement *per se* involuntary, the effect of psychological pressure or deception on the voluntariness of a statement depends on the particular circumstances in each case." *Farley*, 607 F.3d at 1328. "Even if some police tricks may be 'objectionable as a matter of ethics,' they are not relevant to the constitutional

validity of a waiver unless they interfere with the defendant's 'ability to understand the nature of his rights and the consequences of abandoning them.'" *Farley*, 607 F.3d at 1330 (quoting *Moran*, 475 U.S. at 423-24).

Nothing in the record that indicates that Mr. Williams misunderstood the nature of his Fifth Amendment rights or the consequences of abandoning those rights. In fact, the record suggests the opposite. The record shows that Mr. Williams understood his rights and was strategic in his exercise of those rights. Aware that officers had a search warrant for his house and that the bulk of his drugs were located a short distance from his property, after Sergeant Dockery advised him of his *Miranda* rights, Mr. Williams admitted that he had methamphetamine in his house, but he said nothing about the large quantity of meth stashed in brush in an area beyond his property. After Mr. Williams watched officers search unsuccessfully for drugs in his yard, when Sergeant Dockery told Mr. Williams that Froggy was in custody, Mr. Williams maintained his silence about the hidden drugs because he was not sure that officers had Froggy. For all Mr. Williams knew, Sergeant Dockery was lying to persuade him to disclose the location of the meth. After Sergeant Dockery produced Froggy, Mr. Williams reassessed. To gauge the benefit of cooperating, Mr. Williams asked Sergeant Dockery how he might be charged for the drugs. Based on the information that Sergeant Dockery provided, Mr. Williams chose to cooperate, just like Froggy.

Thus, the Court finds that Mr. Williams understood his rights under the Fifth Amendment, and he waived those rights voluntarily. Consequently, Mr. Williams's inculpatory statements and conduct concerning the methamphetamine located beyond the boundary of his property are admissible.

## CONCLUSION

For the reasons stated, the Court denies Mr. Williams's motion to suppress.

**DONE** and **ORDERED** this 22nd day of July, 2019.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE